UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

POWER SURVEY, LLC,  :  Civil Action No. 13-5670(FSH)
:
            Plaintiff,  :
:
      v.  :  **OPINION**
:
PREMIER UTILITY SERVICES, LLC,  :
et al.,  :
            Defendants.  :  November 21, 2014
_____  :

**HOCHBERG, District Judge:**

This matter comes before the Court upon a Motion for a Preliminary Injunction filed by Plaintiff Power Survey, LLC (hereinafter "Power Survey" or "Plaintiff").  The Court has reviewed the submissions of the parties and held an evidentiary hearing on the motion on September 4, 2014.

**I.    BACKGROUND**

Power Survey sued Defendant L-3 Communications Holdings, Inc. d/b/a Narda Safety Test Solutions (hereinafter "Narda") and Defendant Premier Utility Services, LLC (hereinafter "Premier" or "Premier Utility") (collectively, "Defendants") for patent infringement under the patent laws of the United States, 35 U.S.C. §§ 100, et seq.  Power Survey holds three issued patents and has several patents pending in the United States Patent and Trademark Office (USPTO) relating to methods and systems for detecting contact or stray voltage (hereinafter

"stray voltage").[1]  The three patents at issue in this case are:  (1) 8,482,274; (2) 8,536,856; and (3) 8,598,864.  All three patents were invented by David Kalokitis, Leonard J. Schultz, Christos A. Polyzois, and Vincent Paragano.  Power Survey has owned the patents at all relevant times.

Prior to Power Survey's invention, utility companies manually inspected for stray voltage.  This required field technicians with handheld probes to test potentially hazardous structures on foot.  Manual detection proved ineffective because it did not detect stray voltage from buried cables, a common source of stray voltage, and it was limited to surfaces directly touched by the probe.

Power Survey increased the effectiveness and increased the efficiency of the process when it developed a vehicle-mounted detection system called the SVD2000.  The SVD2000 was designed to locate any stray voltage hazards within an entire geographic region from a moving vehicle, hence not limited to surfaces it manually contacts.  Since its development, the SVD2000 has successfully serviced clients in the United States, Canada, and Europe.  Power Survey currently maintains thirty-two SVD2000 systems, eleven of which are typically not in use and thus available to service new business.  Power Survey also has five complete sets of SVD2000 hardware available to build an additional five units.

Narda makes, uses, offers for sale, sells, or imports the Narda Models 8950/10 and 8950/20.  The Narda machines are essentially identical to Plaintiff's SVD2000 system.  Narda's 8950/10 system is designed to be mounted on a vehicle to perform mobile-stray-voltage

---

[1]  Stray voltage is "an elevated voltage condition that appears on or near the elements of an electric-distribution system and the devices it supplies."  Stray voltage may be caused by damaged or deteriorated electrical insulation, workmanship issues, design flaws, infrastructure decay.  Stray voltage on structures and surfaces that are publicly accessible, such as metal fences, street lights, traffic signals, fire hydrants, bus shelters, and even sidewalks, create a potential safety hazard.  Exposure of a person or animal to contact voltage may lead to serious injury or death.

detection, and Premier uses the systems to provide mobile-stray-voltage-detection services. Plaintiff alleges that these products infringe their patents-in-suit. Power Survey also alleges that Premier makes, uses, offers for sale, sells, or imports its own Mobile Contact Voltage Detection System that infringes on one or more of its patents.

Power Survey's core business is mobile contact voltage detection, which comprises essentially all of its revenue. Power Survey has limited its business to providing these services directly to utility companies. Power Survey does not license its technology and has never sold any of its systems.[2]

A study conducted by Power Survey compared the Narda 8950/10 with their SVD2000 after Premier conducted a mobile survey using the Narda 8950/10 in Rochester, NY. Premier only detected 40 energized structures. Power Survey ran a concurrent survey and detected 251 energized structures, some of which were energized at full-line voltage. This represented an 84% false negative rate in the Premier/Narda vehicle mounted product. According to a 2012 report by National Testing Systems, an independent testing laboratory, Premier detected only 30 hazards using Narda's 8950/10 in an area where Power Survey's SVD2000 detected 230, an 87% false negative rate for Premier/Narda.

Power Survey alleges that it has suffered irreparable harm from Defendants' infringement that will continue as long as they continue to infringe their patents. Power Survey argues that detecting stray voltage is their only line of work and that Defendants are larger corporations with more diverse product lines, which allows them to provide similar services at a lower cost for the sake of attracting new customers.

---

[2] Only Sarnoff, the previous owner of Power Survey, sold the SVD2000 systems. Power Survey has since sought to repurchase those systems wherever possible.

3

Power Survey argues that monetary damages cannot adequately remedy these harms because Defendants' infringement is preventing it from growing the market. Power Survey claims to have stopped spending money lobbying for the enactment of new regulations requiring mobile contact voltage detection because it felt that doing so would lead to more business for Premier. Power Survey further argues that the use of Narda's system in the manner used by Defendants, which has been shown to detect less stray voltage, poses serious safety risks. Lastly, Power Survey asks for an injunction because the next round on annual contract bids will be solicited soon.

## II. STANDARD OF REVIEW

Federal Circuit law governs the standards for granting an application to preliminarily enjoin alleged patent infringement. *See Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988). "The decision to grant or deny . . . injunctive relief is an act of equitable discretion by the district court." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). A preliminary injunction is an "extraordinary remedy." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1375 (Fed. Cir. 2009). "[A]ll findings of fact and conclusions of law at the preliminary injunction stage are subject to change upon the ultimate trial on the merits." *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001).

A plaintiff seeking a preliminary injunction must establish the following four factors: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To establish an entitlement to this type of relief, a plaintiff must make a "clear showing" of that entitlement. *Id.* at 22.

## III. DISCUSSION

### A. Likelihood of Success on the Merits

The likelihood of success on the merits is based on the validity of the patent and the infringement of said patent. *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988); *Amazon.com, Inc. v. Barnesandnoble.com, Inc*., 239 F.3d 1343, 1350 (Fed. Cir. 2001). A preliminary injunction should not be granted "if the alleged infringer raises a substantial question regarding either infringement or validity" of the patent. *AstraZeneca LP v. Apotex, Inc.,* 633 F.3d 1042, 1050 (Fed. Cir. 2010).

#### 1. *Infringement*

Power Survey seeks to demonstrate that Premier directly infringes its patents under 35 U.S.C. § 271(a) and that Narda directly and indirectly infringes their patents under 35 U.S.C. § 271(a), (b), and (c). "Literal infringement involves a two-step determination: the proper construction of the asserted claim and a determination whether the claim as properly construed reads on the accused product or method." *Bell & Howell Document Mgmt. Products Co. v. Altek Sys.*, 132 F.3d 701, 705 (Fed. Cir. 1997) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)). The relevant determination for the court in granting a preliminary injunction is a substantial likelihood of success on the merits, "not a legal conclusion as to the ultimate issue of infringement." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1355–56 (Fed. Cir. 2001).

##### a. *Claim Construction*

In a patent infringement preliminary injunction analysis, the first step is to analyze the likely meaning and scope of the claims of the patent. *Markman*, 52 F.3d at 976. At this stage of the litigation, the Court has not yet had the benefit of a *Markman* hearing, which is scheduled to occur

in March, 2015. For purposes of this preliminary injunction motion, the standard is the likely claim construction of key terms of the patent claims. When the parties later argue their *Markman* positions, the Court will conduct a classic *Markman* analysis, according to the well-known legal standards set by the Federal Circuit.

For purposes of this preliminary injunction motion, the Court will tentatively construe the only disputed patent claim term that the parties agree is relevant to the Preliminary Injunction analysis: "voltage anomaly." All parties agree that the Court should adopt the plain and ordinary meaning of "voltage anomaly." However, the parties disagree as to what is that plain and ordinary meaning. Power Survey argues that the Court should construe voltage anomaly as a "detected electric field signal above a threshold or background." Defendants contend that this Court should construe "voltage anomaly" to mean "unexpected voltage."

Defendants posit that Power Survey has not shown that it is likely to prevail on infringement because Power Survey's claims each include the detection of an "unexpected voltage "and the "accused systems are incapable of determining if an electric field is created by an unexpected voltage or an expected voltage." Defendants argue that its "accused systems detect electric fields but the systems are adjusted so that they detect electric fields that are stronger than the 'background' electric fields, *i.e.*, they only detect electric fields above a certain threshold." In essence, Defendants' system measures an input of a certain threshold level of an electric field and then detects electric fields over that threshold amount. But, Defendants argue, its process does not decide what is "expected" or "unexpected." The crux of Defendants' argument is that because the plain and ordinary meaning of "voltage anomaly" is "unexpected voltage" and because the accused system cannot distinguish between an expected or unexpected

voltage, but only whether or not the voltage is over a certain threshold, its system does not infringe. This may be the ultimate semantics circle.

The Court finds, for purposes of this preliminary injunction motion, that a person of ordinary skill in the art would not be likely to deem a "voltage anomaly" to be an "unexpected" voltage, in light of the specification.[3] Rather, the skilled artisan would likely understand "voltage anomaly" to mean "detecting an electric field above a baseline threshold."

The specification likely supports Plaintiff's construction of the term "voltage anomaly" because in several places the specification instructs that when the system alerts on an electric field strength that exceeds a certain threshold, a voltage anomaly exists.

Accordingly, the Court will construe "voltage anomaly" to mean "detecting an electric field above a baseline threshold" for purposes of the instant motion, subject to final determination following the *Markman* hearing scheduled for March, 2015.

### b. Comparison

Plaintiff has provided the chart below to assist the Court in comparing Claim 1 of the '274 as construed by the Court with the allegedly infringing device.

---

[3] The term "voltage anomaly" is used numerously throughout the relevant Claim 1 of the '274 patent. Because the language of Plaintiff's '274 patent denotes that the manner in analyzing a voltage anomaly is "based on an expected frequency" the Defendants' proposed claim construction for, *e.g.*, Claim 1 of the '274 would read: analyzes the field strengths to identify a line frequency *unexpected voltage* in the electric field, wherein the electric field data is analyzed based on an expected frequency pertaining to line frequency *unexpected voltage*. The use of "unexpected voltage" with an "expected frequency" is illogical in this context. Clearly, the claims themselves anticipate that these voltage anomalies will occur against a background of an expected frequency and these voltages are not unexpected at all.

| Claim 1 of the '274 Patent | Premier's Use of |
|---|---|
| 1. A mobile apparatus mounted to a motor vehicle for detecting an electric field, comprising: | Premier uses Narda's 8950/10 mounted to a pickup truck. Narda's 8950/10 is a mobile apparatus for detecting an electric field. (Fugate ¶35, 1A.) |
| at least one sensor probe, coupled to an electrically non-interfering support frame mounted to the vehicle, that generates a signal corresponding to an electric field detected by the at least one sensor probe as the sensor probe moves past a plurality of conductive objects proximate a street, | The 8950/10 has an E-field Sensor attached to an electrically non-interfering vehicle mount supplied with the system. Sensor probes in the 8950/10 E-field Sensor generate signals corresponding to an electric field detected by the sensor probes as the vehicle on which the 8950/10 is mounted is driven past conductive objects on a street to perform mobile stray voltage testing. (Fugate ¶35, 1B.) |
| wherein the at least one sensor probe comprises two or more electrodes, and | The sensor probes of the 8950/10 E-field Sensor are each made up of a pair of parallel plates. Each plate is an electrode. (Fugate ¶35, 1C.) |
| wherein the two or more electrodes are each separated by a rigid insulator; | Each pair of parallel plates in the 8950/10 E-field Sensor is separated by a rigid, insulating, black foam structure. (Fugate ¶35, 1D.) |

| | |
|---|---|
| a processor, coupled to the at least one sensor probe, that digitizes the signal to form electric field data represented as a plurality of time domain samples, produces field strengths of each of the at least one sensor probes using the plurality of time domain samples, and analyzes the field strengths to identify a line frequency voltage anomaly in the electric field, wherein the electric field data is analyzed based on an expected frequency pertaining to the line frequency voltage anomaly, wherein the voltage anomaly is generated by leakage of electric power from a power grid to at least one energized object in the plurality of conductive objects proximate the street; and | The sensor probes are connected to circuitry in the 8950/10 E-field Sensor that includes, among other things, an analog-to-digital converter (ADC) that receives the signals generated by the sensor probes corresponding to the electric field data. The ADC digitizes the signals, converting the signals from the analog domain to the digital domain, and provides time domain samples as output.<br><br>The time domain samples are received by a digital signal processor, which uses the time domain samples to produce the field strengths for the sensor probes.<br><br>The 8950/10 system is further supplied with a computer with pre-installed software that allows for analysis of the field strengths to identify a stray voltage.<br><br>The 8950/10 is designed to detect stray voltage that is generated by leakage of electric power from a utility's power grid as the vehicle is driven along city streets. The measured electric-field data, therefore, is analyzed based on the expected frequency of a stray voltage anomaly, 60 Hz. (Fugate ¶35, 1E.) |
| an indicator, coupled to the processor, that alerts a user to a presence of the voltage anomaly in the electric field and indicates that at least one conductive object proximate the street is energized to a potentially harmful level. | The 8950/10 pre-installed software on the laptop computer uses both audio and visual indicators to alert the driver and passenger of the moving vehicle to the presence of stray voltage on a conductive object next to the street on which the vehicle is travelling. (Fugate ¶35, 1F.) |
| 2. The apparatus of claim 1, further comprising at least one analog to digital converter coupled to each of the two or more electrodes for digitizing electric signals received from the two or more electrodes representative of the electric field detected. | As described above in the analysis of claim 1, the signals generated by the sensor probes are fed to an ADC in the 8950/10 E-field Sensor. (Fugate ¶35, 2A.) |

| | |
|---|---|
| 8. The apparatus of claim 1, further comprising a computer having a graphical user interface that displays electric field signal strength data, and analyzing and capturing a monitored event within the depicted electric field signal strength data. | The software on the computer supplied with the 8950/10 has a graphical user interface that displays, among other things, the E-field signal strength data detected by the 8950/10.<br><br>The software also allows capture and analysis of monitored stray voltage events through, for example, data logging, plotting, and comparison of signal strength data to threshold values. (Fugate ¶35, 8A.) |

Because the Court has found it likely that "voltage anomaly" means "detecting an electric field above a baseline threshold," Plaintiff has shown a likelihood of success on the merits in proving that Defendants' 8950/10 device practices every element of Claim 1 of the '274 patent, and thus a likelihood of success in proving that Defendants' accused systems infringe Plaintiff's patents.

### 2. Invalidity

Defendants argue that there are substantial questions concerning the validity of Power Survey's patents in suit because they are: 1) obvious; and 2) have disputed fact issues as to inventorship.

#### a. Obviousness

"A patent may not issue 'if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.,* 676 F.3d 1063, 1068 (Fed. Cir. 2012) (quoting 35 U.S.C. § 103(a)), *cert. denied*, 133 S.

Ct. 933 (2013). When determining whether a patent is obvious, a court must consider: "(1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness, such as commercial success, copying, or long felt need." *Fuji Photo Film Co. Ltd. v. Jazz Photo Corp. Inc.*, 173 F. Supp. 2d 268, 272 (D.N.J. 2001) (citing *Graham v. John Deere Co.*, 383 U.S. 1, (1966)). "A party seeking to invalidate a patent based on obviousness must demonstrate 'by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)); *see also In re Beattie*, 974 F.2d 1309, 1312 (Fed. Cir. 1992) ("As long as some motivation or suggestion to combine the references is provided by the prior art taken as a whole, the law does not require that the references be combined for the reasons contemplated by the inventor."). A person of ordinary skill in the art must have a reasonable expectation of success that making a modification to the prior art would successfully result in the claimed element. *Procter & Gamble Co.*, 566 F.3d at 994; *see also Duramed Pharm., Inc. v. Watson Labs., Inc.*, 413 F. App'x 289, 294 (Fed. Cir. 2011) ("A reference, however, is prior art for all that it discloses, and there is no requirement that a teaching in the prior art be scientifically tested, or even guarantee success, before providing a reason to combine. Rather, it is sufficient that one of ordinary skill in the art would perceive from the prior art a reasonable likelihood of success."); *Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1331 (Fed. Cir. Apr. 11, 2014) ("Conclusive proof of efficacy is not necessary to show obviousness. All that is required is a reasonable expectation of success.").

11

Narda proffers three main arguments in support of its contention that Plaintiff's patented inventions were obvious:  1) Narda's alleged system comprised prior art; 2) making an electric field detector mobile by mounting it to automobiles was known and practiced; and 3) a skilled artisan would know that an electric field detector attached to an automobile would be preferable over a manual detector.

Narda posits that its sensor, called the EFA-300, is prior art,[4] and when combined with other allegedly admitted prior art, its system is obvious.  Narda argues that its EFA-300 is the heart of its allegedly infringing system.  Plaintiff's lead inventor, Kalokitis, testified that the EFA-300 is simply a sensor that was a component of Narda's 8950/10 system.  Narda argues that mounting this sensor on an automobile is obvious because doing so was known and practiced.

During the preliminary injunction hearing, Defendants did not elicit testimony or otherwise introduce evidence to compare the remaining elements of the asserted claims, such as an alarm, computer display system for the vehicle operator, and threshold input.  The claims in question include at least a sensor probe, processor, indicator, digital converter, measuring device, and a computer with a graphical interface.  With the exception of the sensor, Defendants do not suggest that any of the other elements of the claims are prior art nor did they adequately compare the asserted claims of the patent with their systems.  Significantly, Defendants have failed to produce any evidence, or indeed make any argument, that would support a finding by this Court that it would be likely to succeed in proving that a skilled artisan would have been motivated to combine the prior art to achieve the claimed invention and that such artisan would have had a reasonable

---

[4] "EFA-300 is prior art because its manual was copyrighted in 2002, over two years before December 2004, the earliest date for the asserted claims."  Narda's Br. 13.

expectation of success in so doing. Therefore, the Court finds that Plaintiff has demonstrated a likelihood of success in proving validity and infringement.

### b. Inventorship Issues

Defendants claim that the patents in suit are vulnerable because only one inventor, Kalokitis, appears on both the patent applications and the patents in suit. Defendants recite that "a patent is invalid if more or less than the true inventors are named" but fails to present evidence regarding the true inventors of the patents-in -suit. *Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1301 (Fed. Cir. 2002). Therefore, whatever the discovery may eventually show regarding inventorship, there is not at this time a question shown on this issue sufficient to negate the showing made to obtain a preliminary injunction.

## B. Irreparable Harm

Irreparable harm refers to damages that cannot be addressed solely by monetary damages. *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). Irreparable harm may include loss of market share, price erosion, and lack of market expansion and must be caused by the infringement. *See Purdue Pharma LP v. Boehringer Ingelheim GmbH*, 237 F.3d at 1368; *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012).

Here, Power Survey asserts harm due to: (1) loss of market share; (2) price erosion, or suppressed contract value; (3) lost opportunities to expand the market; (4) lost future sales; and (5) damage to their reputation. Power Survey asserts that the causal connection between Narda's activity and the irreparable harm is that mobile contact voltage detection is the only feature that drives demand for their product.

Power Survey lost market share after 2010 when Premier began to provide mobile contact voltage detection using Narda machines on its trucks. Premier has directly competed

with Power Survey and has won at least four contracts by providing a lower price, two of which were clients of Power Survey's. Power Survey has the capacity to handle a far greater share of the market. Power Survey currently maintains eleven SVD2000 units idle and has the capacity to build five more. Power Survey also has the necessary staff to capture a far greater market share.

Utility companies often do not see the commercial merit of contact voltage detection, absent legal requirement. This is a safety measure that is costly to provide, and, even where required by regulation, it is subject to price sensitivity because it is a two-supplier market and there is little incentive for the utility not to select the cheaper priced service, even if it may not be as good at detecting serious dangers. Power Survey provides two separate examples of price erosion greater than 50%, which has led to decreased revenue.

Power Survey has had to decrease lobbying expenditures, which were used to educate state regulators about the dangers of contact voltage and the need to require the best detection systems possible. Power Survey spent more than $1 million from 2008 to 2012. If Power Survey were the only provider of such services, it was certain to receive those contracts. After Premier entered the market, Power Survey determined that it could not justify their educational lobbying expense, because it often inured to the benefit of its competitor/likely infringer. As a result, the market for this vital service, necessary to ensure public safety, is not expanding. The harm is exacerbated by the fact that this is a new field. In evaluating the appropriateness of injunctive relief, the Federal Circuit noted that it is appropriate to consider, among other things: (1) the fact that the field of technology covered by the patent is new; (2) the fact that the patentee has a large presence in the field; (3) the patent could help establish a market presence and create business relationships; and (4) in the absence of an injunction, other infringers would be

14

encouraged to join. *Hybritech*, 849 F.2d at 1456. In this case, Power Survey's patent changed the way that stray voltage was detected, so the field of technology is new. Without Premier's presence, Power Survey would be the exclusive provider in the field of mobile stray voltage detection and would be able to establish its market presence and create business relationships expected to endure after the patent expired. It has the capacity to service the market.

Defendants argue that Power Survey does not face the threat of irreparable harm because Power Survey can remain in the marketplace with Premier as a competitor and the "status quo does not irreparably harm." *Nutrition 21 v. U.S.*, 930 F.2d 867, 872 (Fed. Cir. 1991).

Narda argues that Power Survey's alleged loss of market share, lost sales, and price erosion are easily quantifiable and that the claimed lack of market expansion is too speculative. Premier claims that because this decision not to lobby to increase the market was entirely in Power Survey's control, it cannot claim Defendants irreparably harmed it.

Finally, Defendants contend that Power Survey's claim for harmed reputation cannot constitute an irreparable harm. In an odd twist, Defendants support their argument by relying on Power Survey's proofs using statistical data to prove that Plaintiff's product is superior to Defendants' product. Thus, Defendants argue, Power Survey's superior product would naturally become more successful in the market and that the claim of reputational harm is not established. This is a bizarre argument by Defendants, which essentially contends that an injunction should not issue if a likely infringer is producing an inferior product. Here, of course, that inferior product leaves the public at greater risk.

Although Defendants argue that the motion for a preliminary injunction is untimely, Power Survey in fact filed its Complaint within one month of the first two patents in suit being issued. Power Survey began its investigation into Narda's new 8950/20 system immediately

after the new product was announced.  Once Power Survey's third patent was issued ('864) it amended its Complaint, and requested expedited discovery from Defendants.  The parties then entered a three-month-long negotiation regarding the discovery requests.  Power Survey then promptly filed the instant motion.  "If the movant can provide a credible explanation for its inactivity, however, much longer delays may be excused."  *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998).  The Court finds that Power Survey provides reasonable and credible explanations for its timing of the motion for a preliminary injunction.

      This Court finds that Power Survey faces irreparable harm if the preliminary injunction does not issue.  Power Survey has adduced sufficient evidence that it is being irreparably harmed in several ways:    The Court finds that there is evidence that Power Survey suffered, and continues to suffer, price erosion and loss of market share, as a result of Defendants' conduct.  The business of mobile vehicular stray-voltage detection is relatively new and the only providers of service in this field are Power Survey and Premier/Narda.  Without the likely infringement by Defendants, Plaintiff likely would be able to establish its market presence and create strong and lasting business relationships.  Power Survey's presence in the market is being harmed because Defendants can undercut the market both with a cheaper and inferior product.  This may also have an adverse effect on Plaintiff's reputation because some power companies may assume that all of these products have false negative rates regardless of which product they are utilizing.

      Therefore, for the aforementioned reasons, Power Survey will be irreparably harmed if this Court declines to grant its motion for a preliminary injunction.  Accordingly, the Court will turn to balancing the equities between the parties.

...

### C. Balance of Equities

The third factor in the preliminary injunction analysis requires the district court to "balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Hybritech*, 849 F.2d at 1457.

Here, Power Survey argues that because its only source of revenue is the provision of mobile contact voltage detection services that the balance of hardships weighs in favor of granting the injunction. Defendants posit that if the preliminary injunction is granted, they will *likely* terminate employees, give up a line of their business, and be frustrated to complete work on existing contracts. However, Defendants provided no details as to the extent of any layoffs or the effect of any injunction on their core business. Narda, in particular, is an established business in many lines of work unrelated to this injunction. The Court finds that mobile stray voltage detection services are only a minor part of Premier's and Narda's businesses. Granting the injunction, would only affect one line of Defendants' businesses. By contrast, Power Survey's major revenue source is the mobile stray voltage detection services, it would face a greater comparative hardship if the injunction were not granted. In light of these factors, the Court finds that the balance of the hardships weighs in favor of Power Survey, and in favor of granting the preliminary injunction.

### D. Public Interest

The focus of a district court's public interest analysis should be "whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech*, 849 F.2d at 1458.

17

Power Survey argues that the public's interest weighs heavily in favor of granting an injunction because: a) Narda's product is far inferior to Plaintiff's, with an 84% false-negative rate, the public will be exposed to a large number of undetected threats; b) the market for stray voltage testing will not shrink without Premier's lower-priced services; and c) in the absence of an injunction, new regulatory markets will not grow and the public in those areas will remain at risk. Defendants contend that judicially removing its product from the marketplace would result in a burden on the public because it prevents the public from seeking alternatives to Power Survey's product which would permit Plaintiff to increase prices charged to public utilities.

The Court believes that absent an injunction, the public will be exposed to a serious risk of undetected threats of stray voltage in areas scanned by Narda's product. This is a public health risk, which may result in injury or death. Power Survey's study along with the study conducted by National Testing Systems, reveals that Power Survey's SVD2000 detects more contact voltage than Narda's 8950/10. Second, the absence of Premier's lower-priced services will not cause the market for stray voltage detection to shrink. Power Survey has the ability to service the entire market, and it will likely resume its efforts to increase the market size if it's patent right to exclude infringers is honored in this case.

IV.     CONCLUSION

Accordingly, the Court finds that Plaintiff has made a clear showing of its entitlement to injunctive relief and grants Power Survey's request for a preliminary injunction. An appropriate Order shall follow.


                                                  **s/ Faith S. Hochberg**
                                                  **Hon. Faith S. Hochberg, U.S.D.J.**